**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 2, 2020**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**Christopher M. Wolpert**
**Clerk of Court**

SIERRA CLUB,

     Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY; ANDREW
WHEELER, Administrator, United
States Environmental Protection
Agency,

     Respondents,

_____

STATE OF UTAH, on behalf of the Utah
Department of Environmental Quality,
Division of Air Quality; PACIFICORP
ENERGY,

     Respondents - Intervenors,

and

AIR PERMITTING FORUM,

     Amicus Curiae.

No. 18-9507

_____

**Petition for Review of Final Administrative Action of the**
**United States Environmental Protection Agency**
_____

Keri N. Powell, Powell Environmental Law, LLC, Decatur, Georgia (Patton Dycus, Environmental Integrity Project, Decatur, Georgia, with her on the briefs), for Petitioner.

David J. Kaplan, United States Department of Justice, Environmental Defense Section, Washington, D.C. (Jeffrey Bossert Clark, Assistant Attorney General; Jonathan D. Brightbill, Principal Deputy Assistant Attorney General; and John T. Krallman, United States Environmental Protection Agency, with him on the briefs), for Respondents.

E. Blaine Rawson, Ray Quinney & Nebeker P.C., Salt Lake City, Utah (Marie Bradshaw Durrant, PacifiCorp, Salt Lake City, Utah, with him on the briefs), for Respondent-Intervenor PacifiCorp Energy.

Sean D. Reyes, Utah Attorney General; Tyler R. Green, Utah Solicitor General; Christian C. Stephens and Marina V. Thomas, Assistant Utah Attorneys General; Salt Lake City, Utah, for Respondent-Intervenor State of Utah.

Charles H. Knauss, Hunton Andrews Kurth LLP, Washington, D.C.; and Shannon S. Broome, Hunton Andrews Kurth LLP, San Francisco, CA, for Amicus Curiae Air Permitting Forum.

_____

Before **BACHARACH, BALDOCK,** and **MURPHY**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

This petition involves interpretation of an environmental regulation addressing the renewal of permits under Title V of the Clean Air Act. The statute and accompanying regulation allow renewal of these permits only if they ensure "compliance with" all of the "applicable requirements." 42 U.S.C. § 7661c(a); 40 C.F.R. 70.7(a)(1)(iv). The term "applicable requirements" is defined in the regulation, but not the statute. *Envtl. Integrity Project v. EPA*, No. 18-60384, ___ F.3d ___, slip op. at 5–6 (5th

2

Cir. May 29, 2020). The Sierra Club interprets the regulatory definition to require compliance with all existing statutory requirements; the EPA interprets the regulatory definition more narrowly, arguing that the applicability of certain requirements is determined by the state permit issued under a separate part of the Clean Air Act (Title I).

We agree with the Sierra Club's interpretation. The regulatory definition of "applicable requirements" includes all requirements in the state's implementation plan, and Utah's implementation plan broadly requires compliance with the Clean Air Act. So all of the Act's requirements constitute "applicable requirements" under the regulation.

## I. The Clean Air Act's Requirements

To interpret the term "applicable requirements," we must consider the underlying statute (the Clean Air Act). Two of the statutory parts, Titles I and V, bear on the meaning of "applicable requirements" under the regulation. *See Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 752 (9th Cir. 2008).

### A. Title I

The Clean Air Act calls for federal and state cooperation. *Texas v. EPA*, 690 F.3d 670, 677 (5th Cir. 2012). For its part, the EPA sets national air quality standards and provides oversight and enforcement. 42 U.S.C. § 7409. To achieve compliance with these national air quality standards,

3

states must develop implementation plans and submit them to the EPA for approval. *Id.*

These plans require many industrial sources of pollution to obtain preconstruction permits through a process called "New Source Review" (NSR). *Id.* § 7475(a). The states conduct NSR under their implementation plans. *Id.* §§ 7410(a)(2)(C), 7471.

The required NSR differs for "major" or "minor" sources of pollution. *See Envtl. Integrity Project v. EPA*, No. 18-60384, ___ F.3d ___, slip op. at 3 (5th Cir. May 29, 2020) ("The substantive requirements for preconstruction permits differ markedly depending on whether the new source is deemed 'major' or 'minor.'"). Major NSR is required if a new or modified source would emit pollutants above certain thresholds. 42 U.S.C. §§ 7475(a), 7479(1), 7502(c)(5); 40 C.F.R. §§ 51.165(a)(1)(iv)(A), (1)(v)(A), 51.166(b)(1)(i), (b)(2)(i). Only minor NSR is required if emissions would fall below the applicable thresholds. 42 U.S.C. § 7410(a)(2)(C); 40 C.F.R. §§ 51.160–51.164. Minor NSR entails "only the barest of requirements." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 922 (5th Cir. 2012).

**B.  Title V**

Title V is designed to enhance compliance and improve enforcement. *See* S. Rep. No. 101-228, at 346 (1993). Under Title V, the operating permit must include the various statutory limitations on emissions that

apply to a given source. 42 U.S.C. § 7661c(c). Some limitations may be self-executing; others may be source-specific and defined in other permits. *Compare id*. § 7411 (establishing New Source Performance Standards that are self-executing limitations on certain sources), *with id*. § 7475 (requiring certain sources to obtain a permit for Prevention of Significant Deterioration, which entails source-specific limitations). The Title V permit must include all applicable self-executing and source-specific limitations. *Id*. § 7661c(a); *see Envtl. Integrity Project v. EPA*, No. 18-60384, ___ F.3d ___, slip op. at 4 (5th Cir. May 29, 2020) (stating that Title V permits must consolidate all of the information that the source needs to comply with the Clean Air Act).

States are responsible for issuing Title V permits. 42 U.S.C. § 7661a(b), (d). Before issuing a Title V permit, the state must propose the permit to the EPA. *Id*. § 7661d(a), (b). If the proposed permit does not comply with Title V's "applicable requirements," the EPA must object. *Id.* § 7661d(b)(1). If the EPA does not object, others can petition the EPA to compel it to object. *Id.* § 7661d(b)(2). If a petition is filed, the EPA must respond. *Id.* In responding, the EPA must object to the proposed permit upon a demonstration that the source failed to comply with the applicable requirements. *Id.*

Once Title V permits are issued, they are enforceable by the EPA and the public. *Id.* § 7413(a), (b) (by the EPA); *id.* § 7604(a)(1), (f)(4) (by the

5

public). The EPA may enforce a Title V permit either administratively or in federal court. *Id.* § 7413(a), (b).

## II.    The Hunter Plant's Permit for Modifications

The parties' dispute centers on the regulatory requirements for PacifiCorp's modification of an industrial plant known as the "Hunter Plant."

PacifiCorp began the NSR preconstruction permitting process in 1997 in order to modify the plant. In considering PacifiCorp's permit request, Utah determined that the modifications triggered only minor NSR requirements. This determination went unchallenged.

During the same time period, PacifiCorp was obtaining its initial Title V operating permit for the Hunter Plant. Utah ultimately issued the Title V permit in 1998, incorporating Utah's determination that the modifications required only minor NSR. Renewal of the Title V permit was required in 2003 and every five years thereafter. *Id*. § 7661a(b)(5)(B).

In 2001 PacifiCorp applied to renew the Title V permit, but Utah waited roughly fourteen years to act on the application.[1] When Utah finally acted, it renewed PacifiCorp's Title V permit, incorporating the

---

[1]    Utah acted on the application only after the Sierra Club sought mandamus relief.

6

requirements from the minor NSR permit. Utah sent its proposed permit to the EPA, and the EPA did not object.

The Sierra Club filed a petition to compel the EPA to object,[2] arguing in part that the modifications from 1997 to 1999 should have triggered major NSR requirements.

## III.   The Hunter Order

The EPA denied the Sierra Club's petition in 2017. In denying the petition, the EPA did not decide whether the Hunter Plant's modifications should have triggered major NSR requirements. The EPA instead focused on the meaning of the term "applicable requirements," interpreting it as a general reference to the requirements stated in the prior Title I permit:

> Where a final preconstruction permit has been issued, whether it is a major or minor NSR permit, the terms and conditions of that permit should be incorporated as "applicable requirements" and the permitting authority and EPA should limit its review to whether the title V permit has accurately incorporated those terms and conditions . . . .

Joint App'x at 19.

---

[2]   The Sierra Club had also objected in state court to renewal of PacifiCorp's Title V permit, and Utah opposed the objections.

Applying this definition, the EPA relied on Utah's earlier refusal to apply major NSR requirements.[3] So the EPA denied the Sierra Club's petition, finding that

- the proposed permit had accurately incorporated the requirements stated in the minor NSR permit and

- any major NSR requirements were not considered "applicable requirements."

The Sierra Club then sought review of the EPA's decision, and PacifiCorp and the State of Utah intervened as respondents.

## IV. Standing

As a threshold matter, PacifiCorp contends that the Sierra Club lacks Article III standing. A similar contention was lodged in a previous appeal. *Sierra Club v. EPA*, 926 F.3d 844 (D.C. Cir. 2019). In that appeal, the D.C. Circuit determined that the Sierra Club had standing to bring this

---

[3] The EPA explained that the state permitting process was not dispositive for enforcement actions. Joint App'x at 20–21. The EPA thus asserted authority to enforce major NSR requirements even when a state has issued a minor NSR permit. *Id.*

8

challenge. *Id.* at 848–49.[4] We agree with the D.C. Circuit on the Sierra Club's standing.

## A.     Necessity of Standing for Members

When an organization sues on behalf of its members, the organization must show that "its members would otherwise have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000). An organization's members enjoy standing if

> (1) [they have] suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 180–81.

## B.     Injury-in-Fact

In environmental suits, an injury-in-fact exists when the petitioner "use[s] the affected area" and is a person "'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

The Sierra Club alleges that its members experience air pollution because they live and work near the Hunter Plant. Petitioner's Opening Br.

---

[4]     The D.C. Circuit ultimately dismissed the appeal for improper venue. 926 F.3d at 848.

9

at 26; *see* Decl. of Wayne Y. Hoskisson, Add. to Petitioner's Opening Br. at 41–45; Decl. of Darrell Mensel, Add. to Petitioner's Opening Br. at 46–50. According to the Sierra Club, its members experience health risks and diminished visibility of nearby national parks and wilderness areas. Petitioner's Opening Br. at 26. The alleged health risks and diminished visibility constitute an injury-in-fact. *See Friends of the Earth*, 528 U.S. at 181–83 (concluding that an injury-in-fact exists when declarants stated that a nearby river "looked and smelled polluted," curtailing their ability to use the river for recreational purposes).

## C. Causation

For causation,[5] the Sierra Club submits evidence that the Hunter Order contributes to the members' alleged injuries. This evidence satisfies the element of causation.

### 1. The Link Between Regulation and Reduction of Emissions

The Sierra Club's members provide sworn statements, tying the physical and aesthetic injuries to PacifiCorp's ability to skirt major NSR requirements and avoid the need to use the best available control

---

[5]     PacifiCorp's brief contains separate sections on "Traceability" and "Causation." We consider both sections here because traceability constitutes part of the inquiry on causation. *See Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 451 (10th Cir. 1996) ("To establish causation, a plaintiff must show its injuries are fairly traceable to the conduct complained of.").

technology. If these sworn statements are credited, the EPA could have alleviated the harms by requiring PacifiCorp to reduce emissions from the Hunter Plant. These sworn statements thus satisfy the element of causation. *See WildEarth Guardians v. EPA*, 759 F.3d 1196, 1206–07 (10th Cir. 2014) (concluding that the plaintiff showed causation when the EPA's alleged error could have prevented a further reduction in emissions).

### 2.    PacifiCorp's Arguments

PacifiCorp argues that

*   the Sierra Club caused its own injuries by failing to petition for the EPA to object in 1997,

*   other industrial sources contribute to the alleged pollution,

*   the Sierra Club links its injuries to unrelated modifications at the Hunter Plant in 2010, and

*   the Hunter Plant has decreased emissions since 1997.

These arguments fail.

### a.    The Sierra Club's Purported Infliction of Its Own Injury

PacifiCorp argues that the Sierra Club caused its own injury by failing to act for over twenty years. We reject this argument.

PacifiCorp's argument rests on the inability of parties to artificially manufacture standing by "inflicting harm on themselves." *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 416 (2013). When a petitioner inflicts its own harm, its conduct has broken the chain of causation. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 n.8 (10th Cir. 2005).

11

The Sierra Club alleges that its members have experienced physical and aesthetic harm from the Hunter Plant's emissions. Even if the Sierra Club could have acted earlier, its delay did not break the chain of causation. The alleged injuries resulted from emissions allowed under PacifiCorp's Title V permit. At most, the Sierra Club's inaction allowed the pollution to continue unabated. But the Sierra Club's inaction did not cause the pollution.

b.     **Other Contributors to the Pollution**

PacifiCorp also argues that other sources contributed to the pollution. But the existence of other contributors wouldn't affect the Sierra Club's standing. Even with other contributors, standing would still turn on whether the Sierra Club had adequately attributed the pollution at least partly to the Hunter Order. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 558 (5th Cir. 1996) (stating that the Sierra Club could satisfy causation by showing that the industrial source had contributed, along with others, to water pollution). And the Sierra Club's members state under oath that the Hunter Plant contributed to the pollution. *See* Decl. of Wayne Y. Hoskisson, Add. to Petitioner's Opening Br. at 41–45; Decl. of Darrell Mensel, Add. to Petitioner's Opening Br. at 46–50.

PacifiCorp argues that the members are just speculating about pollution from the Hunter Plant. But the EPA has stated elsewhere that

12

"[a]ir emissions from [the Hunter Plant and another PacifiCorp plant] cause or contribute to visibility impairment" in nearby national parks. Approval, Disapproval and Promulgation of Air Quality Implementation Plans; Partial Approval and Partial Disapproval of Air Quality Implementation Plans and Federal Implementation Plan; Utah; Revisions to Regional Haze State Implementation Plan; Federal Implementation Plan for Regional Haze, 81 Fed. Reg. 2,004, 2,013 (Jan. 14, 2016). Given the EPA's acknowledgment of visibility impairment from the Hunter Plant, we cannot disregard the members' allegations of a causal connection.

### c.    Pollution from the 2010 Modifications

PacifiCorp also observes that the Sierra Club complained about pollution from unrelated modifications that had been made in 2010. But those complaints do not affect the Sierra Club's standing. The claim here links the injuries to the Hunter Plant's failure to comply with major NSR requirements for the 1997–1999 modifications. A causal link would exist even if the 2010 modifications had exacerbated the pollution.

### d.    Decreases in Emissions

PacifiCorp also points to a reduction in the Hunter Plant's emissions since 1997. But the Sierra Club presented evidence that major NSR could have lowered emissions even more. *See Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019) ("Even if the Hunter Plant has made progress in reducing its emissions, neither it nor EPA disputes that its emissions could

13

be reduced further to alleviate harm . . . ."); *see also WildEarth Guardians v. EPA*, 759 F.3d 1196, 1207 (10th Cir. 2014) (concluding that the plaintiff satisfied causation because the desired action "could have reduced . . . emissions still further"). So standing exists despite the purported reduction in emissions since 1997.

* * *

The Sierra Club has adequately established causation for standing.

### D.    Redressability

The Sierra Club asserts that this Court can redress the alleged injuries by vacating the Hunter Order and remanding to the EPA to consider the applicability of major NSR requirements. We agree.

PacifiCorp again contends that the Hunter Plant has already reduced its emissions since 1997. But the Sierra Club alleges that a favorable determination could reduce emissions even more by requiring PacifiCorp to use the best available control technology. None of the respondents rebut that allegation or argue that the plant currently uses the best available control technology. Absent such a rebuttal or argument, the potential for further improvement satisfies the requirement of redressability. *See Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019) (concluding that the Sierra Club had standing, reasoning that "[e]ven if the Hunter Plant [had] made progress in reducing its emissions," neither PacifiCorp nor the EPA

had disputed the potential for further reductions in emissions to soften the injury experienced by the Sierra Club's members).

PacifiCorp argues that this analysis erroneously shifts the burden of proof to the respondents to disprove standing. It is true that petitioners bear the burden to establish standing. *Loving v. Boren*, 133 F.3d 771, 772 (10th Cir. 1998). But PacifiCorp does not dispute the Sierra Club's evidence that emissions would have dropped with use of the best available control technology.[6] This evidence satisfies the element of redressability.

\* \* \*

Given the evidence of an injury-in-fact, causation, and redressability, the Sierra Club has established standing.

## V. Regulatory Definition of "Applicable Requirements"

The Sierra Group's petition for review turns on the meaning of the term "applicable requirements." The regulatory definition of this term unambiguously refers to all requirements in a state's implementation plan, such as Utah's requirement for major NSR.

---

[6]    PacifiCorp contends that a new Title I permit in 2008 reduced the emission limits and required installation of new pollution-control equipment. But PacifiCorp does not suggest that these changes in 2008 maximized the possible reduction in emissions.

15

## A.    Judicial Review of Agency Action

To assess an agency's interpretation of its own regulation, we sometimes apply a form of deference known as "*Auer* deference." *See Auer v. Robbins*, 519 U.S. 452 (1997). Under *Auer* deference, we consider an agency's interpretation to be controlling unless it is "plainly erroneous or inconsistent with the regulation." *Id.* at 461.

We apply *Auer* deference only if the regulation is genuinely ambiguous. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). To assess ambiguity, we use the traditional tools of construction, such as the regulatory "text, structure, history, and purpose." *Id.* at 2415.

## B.    Lack of Ambiguity in the Regulation

We conclude that the regulation is not ambiguous. It unmistakably requires that each Title V permit include all requirements in the state implementation plan, including Utah's requirement for major NSR.

The regulation provides:

Applicable requirement means *all* of the following as they apply to emissions units in a part 70 source . . . :

(1) *Any* standard or other requirement *provided for in the applicable implementation plan* approved . . . by EPA . . . .

40 C.F.R. § 70.2 (emphases added). The "applicable implementation plan" here is Utah's, and Utah's implementation plan requires major NSR. *See*

16

Utah Admin. Code r. 307-405-2 (2019).[7] Given the need to comply with Utah's implementation plan, the regulatory definition of "applicable requirement" unambiguously includes major NSR requirements.

## C. The EPA's Three Arguments in Favor of Ambiguity

The EPA argues that the regulatory language is ambiguous for three reasons:

1. The first item in the regulatory definition is a general catch-all narrowed by the second item;

2. the regulatory definition contains a qualifier ("as they apply"); and

3. the EPA intended Title V permits only as a convenient place to consolidate the requirements already imposed in other administrative proceedings.

These arguments clash with the regulatory text.

## 1. The Definition's Second Item

The definition of "applicable requirement" includes thirteen separate requirements. The parties agree that only the first two requirements are at issue. Of these two, the EPA argues that when a preconstruction permit has been issued, the "general reference to [state-implementation-plan] requirements in part (1) should be read in consideration of the more specific part (2)." EPA's Resp. Br. at 35. Part (2) is "[a]ny term or

---

[7] Every state implementation plan must include the requirements for major NSR. *See* 42 U.S.C. §§ 7410(a)(2)(c), 7471, 7502(c)(5) (requiring state implementation plans to include major NSR requirements).

17

condition of any preconstruction permits issued pursuant to regulations approved or promulgated through rulemaking . . . ." 40 C.F.R. § 70.2. This part supplies just one of the thirteen requirements, and the "applicable requirements" are defined as the combination of "all" of the thirteen requirements. 40 C.F.R. § 70.2.[8] So Part (2) does not limit any of the other twelve requirements.

Rather than limit the other requirements, Part (2) clarifies that terms in the preconstruction permits supply additional requirements. *See* Operating Permit Program, 57 Fed. Reg. 32,250, 32,276 (July 21, 1992) ("This definition was changed in part to clarify that applicable requirements *include* terms and conditions of preconstruction permits . . . ." (emphasis added)).

For support, the EPA points to a canon stating that a specific provision prevails when it conflicts with a general provision. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 183 (2012). But the requirements in Parts (1) and (2) do not conflict. Some requirements might not appear in a preconstruction permit, and those requirements could trigger Part (1) even if they're not covered by Part (2).

---

[8]    The list also conjoins the twelfth and thirteenth items with "and," creating a *syndeton*, which is equivalent to including "and" between each item. 40 C.F.R. § 70.2; *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 118 (2012).

18

The EPA contends that the Sierra Club's interpretation would render Part (2) redundant unless it is read to constrain Part (1). But Part (2) is not redundant under the Sierra Club's interpretation. Part (2) would retain independent meaning because requirements could appear in a Title I permit but not appear in the state's implementation plan. *See* Operating Permit Program, 57 Fed. Reg. 32,250, 32,276 (July 21, 1992) (explaining that Part (2) was added to "clarify that applicable requirements *include* terms and conditions of preconstruction permits issued pursuant to [state implementation plans]" (emphasis added)). Those requirements could trigger Part (2) without triggering Part (1). So Parts (1) and (2) simply provide separate requirements for Title V permits. *See Reyes-Vargas v. Barr*, No. 17-9549, ___ F.3d ___, slip op. at 15 (10th Cir. May 14, 2020) (concluding that two provisions do not conflict or create an ambiguity because each provision applies within its own realm).

## 2. The Qualifier "As They Apply"

The EPA highlights the phrase "as they apply" in the opening of the definition: "Applicable requirement means all of the following *as they apply* to emission units in a part 70 source . . . ." 40 C.F.R. § 70.2 (emphasis added). The EPA argues that this language refers only to the conditions imposed in earlier preconstruction permits.

The EPA reads too much into the phrase "as they apply." Part (2) of the definition clarifies that the term "applicable requirement" *includes* the

19

terms from a preconstruction permit. *See* p. 18, above. Nowhere does the regulation *limit* "applicable requirements" to the terms in earlier preconstruction permits. So the qualifier "as they apply" sheds little light on the meaning of Part (1).

### 3. The EPA's Intent

The EPA also points to evidence of its intent when adopting the regulation. But when the regulation was adopted, the EPA intended to broadly use the term "applicable requirement," referring to compliance with all of the requirements in the state's implementation plan. For example, the EPA provided guidance to the states on how to implement the new procedures for Title V permits. William G. Rosenberg, Envtl. Prot. Agency, Guidance to States on Authority Necessary to Implement the Operating Permits Program in Title V of the Clean Air Act Amendments of 1990 (May 21, 1991). This guidance instructed state regulators that "each permit" had to contain provisions for "applicable requirements," defined as "limits and conditions to assure compliance with all applicable requirements *under the Act, including requirements of the applicable implementation plan.*" *Id.* at 5 (cleaned up) (emphasis added).[9]

---

[9] We take judicial notice of this document, which is published on the EPA's website. *See Sierra Club v. EPA*, 762 F.3d 971, 975 n.1 (9th Cir. 2014) (taking judicial notice of the EPA's "public guidance"); *Nebraska v. EPA*, 331 F.3d 995, 998 n.3 (D.C. Cir. 2003) (taking judicial notice of information on the EPA's database).

### a. The EPA's Reliance on Snippets from the Preamble

Despite this contemporaneous definition of the term "applicable requirement," mirrored in the regulatory text, the EPA relies on snippets from the regulation's preamble. The preamble cannot override the unambiguous meaning of the regulatory language. *See Peabody Twentymile Mining, LLC v. Sec'y of Labor*, 931 F.3d 992, 998 (10th Cir. 2019) ("[T]he preamble . . . cannot be read to conflict with the language of the regulation itself."). So our consideration of the preamble must bow to the unambiguous regulatory definition of "applicable requirements." Because the text of the regulatory definition is unambiguous, we need not consult the preamble for guidance. *See Callahan v. U.S. Dep't of Health and Human Servs. through Alex Azar II*, 939 F.3d 1251, 1262 (11th Cir. 2019) (stating that "[b]ecause [the] text is clear, we needn't consult extra-textual evidence concerning 'history' and 'purpose'").

Even if we were to consider the preamble, it would not support the EPA's narrow interpretation of the term "applicable requirements." For example, the EPA points to the preamble's statement that "title V generally does not impose substantive new requirements." Operating Permit Program, 57 Fed. Reg. 32,250, 32,251 (July 21, 1992). PacifiCorp similarly points to guidance documents, arguing that Title V permits are intended to "record[] *existing* substantive requirements applicable to regulated sources." Lydia N. Wegman, Envtl. Prot. Agency, EPA White Paper for Streamlined

21

Development of Part 70 Permit Applications 1 (July 10, 1995) (emphasis added).

But the requirement for an appropriate major NSR permit is not a "new" substantive requirement; the major NSR requirement had long existed in Title I and every state implementation plan. So compliance with the state's implementation plan already existed as an applicable requirement:

> Title V imposes no new requirements on sources. Rather, it consolidates existing air pollution requirements into a single document, the Title V permit, to facilitate compliance monitoring. Sources subject to Title V may not operate in violation of, or without, a Title V permit containing all applicable requirements. [State-implementation-plan] requirements are, of course, applicable requirements.

*Sierra Club v. Leavitt*, 368 F.3d 1300, 1302 (11th Cir. 2004) (citations omitted).

The EPA also points to the preamble's admonition against second-guessing NSR determinations:

> The primary intent of these "enhancements" of the NSR process is to allow the permitting authority to consolidate NSR and title V permit revision procedures. As stated in the May 10, 1991 proposal, *it is not to second-guess the results of any State NSR determination.*

Operating Permit Program, 57 Fed. Reg. 32,250, 32,289 (July 21, 1992) (emphasis added). The EPA argues that this language shows an unwillingness to "second-guess" states' decisions about the applicability of major NSR requirements.

22

But the "second-guess" language is immediately followed by an example: that the EPA will not try to revise states' analyses of the best available control technology, which is part of major NSR. *Id.* Given this example, the preamble is apparently referring to the requirements *within* an NSR permit (major or minor), which fall within the states' discretion. The language does not refer to the need for major or minor NSR.[10]

Indeed, before issuing the Hunter Order, the EPA had repeatedly insisted that it could object to the omission of major NSR requirements without "second guess[ing] state decisions." Conditional Approval of Implementation Plan; Indiana; 68 Fed. Reg. 9,892, 9,894–95 (Mar. 3, 2003) (Indiana's major NSR rules); Approval and Promulgation of Implementation Plans; Ohio, 68 Fed. Reg. 2,909, 2,911 (Jan. 22, 2003) (Ohio's major NSR rules); Approval and Promulgation of Air Quality Implementation Plans; Commonwealth of Virginia– Prevention of

---

[10] The preamble also refers to proposed regulations, which had similar language:

> [A]ll applicable requirements under the Act includes the requirements imposed in any NSR permit. Any requirements established during the preconstruction review process also apply to the source . . . . If the source meets the limits in its NSR permit, the title V operating permit would incorporate these limits without further review. The intent of title V is not to second-guess the results of any State NSR program.

56 Fed. Reg. at 21,738–39. In context, the "second-guess" language focuses on the contents of the NSR permit, not the threshold decision on the applicability of major NSR requirements.

23

Significant Deterioration Program, 63 Fed. Reg. 13,795, 13,796–97 (Mar. 23, 1998) (Virginia's major NSR rules). Given its consistent usage of the phrase "second-guess," the preamble appears to address *how* states implement the NSR requirements (like identifying a source's best available control technology), not the threshold issue of *whether* major NSR requirements apply to a given source.

The EPA also highlights language that "[d]ecisions made under the NSR and/or PSD programs [e.g., best available control technology (BACT)] define certain applicable [state-implementation-plan] requirements for the title V source." Operating Permit Program, 57 Fed. Reg. 32, 250, 32,259 (July 21, 1992) (some brackets in original). But that sentence includes qualifying language, stating that permitting decisions define *certain* applicable requirements rather than *all* of the applicable requirements. That sentence more naturally refers to Part (2) of the regulatory definition, not Part (1). This language in the preamble does not narrow the broad scope of the regulatory definition in Part (1). *See* pp. 17–19, above.

### b. Other Parts of the Preamble

We must consider these snippets along with the rest of the preamble, which shows a regulatory aim of enhancing compliance with the statutory requirements in Title I. Consider five examples from the preamble:

24

1.	"The [title V] program will generally clarify, in a single document, which requirements apply to a source and, thus, should enhance compliance with the requirements *of the Act*." 57 Fed. Reg. at 32,251 (emphasis added).

2.	"The title V permit program will enable the source, States, EPA, and the public to understand better the requirements to which the source is subject, and whether the source is meeting those requirements." *Id.*

3.	"Currently, many enforcement actions are hindered by disputes over *which Act requirements* apply.[11] Under the permit system, these disputes will no longer arise because any differences among the State, EPA, the permittee, and . . . the public as to *which of the Act's requirements* apply to the particular source will be resolved during the permit issuance and subsequent review process." *Id.* at 32,266 (emphasis added).

4.	"Title V requires that operating permits assure compliance with each applicable standard, regulation, or requirement *under the Act*, including the applicable implementation plan. Thus, the permitting authority and EPA should clearly understand and agree on what requirements *under the Act* apply to a particular source." *Id.* at 32,275 (emphasis added).

5.	"The proposal defined 'applicable requirements' as the substantive requirements *arising under other sections and titles of the Act*." *Id.* (emphasis added).[12]

---

[11]	The EPA regards the term "disputes" as referring only to "the problem of confusion" arising from multiple permits containing various requirements. EPA's Resp. Br. at 41. But the sentence refers to "disputes over which Act requirements apply." Operating Permit Program, 57 Fed. Reg. 32, 250, 32,266 (July 21, 1992). The sentence does not suggest that the regulation's sole focus was to consolidate requirements sprinkled among multiple permits.

[12]	The Fifth Circuit recently analyzed a related issue. In evaluating the EPA's interpretation of the accompanying statute, the Fifth Circuit reasoned in part that the "second-guess" language in the regulatory preamble disavowed an intent to add any substantive requirements to the Clean Air Act. *Envtl. Integrity Project v. EPA*, No. 18-60384, __ F.3d __,

25

These excerpts suggest that the phrase "applicable requirements" encompasses all requirements under the Clean Air Act—not just the requirements already included in permits that are issued under Title I.

### c. The EPA's Longstanding Interpretation of the Term "Applicable Requirements"

Finally, the EPA contends that the preamble supplies evidence of a "contemporaneous" interpretation of the regulation. EPA's Resp. Br. at 41–49. A contemporaneous construction could shed light on ambiguous language because the drafters usually occupy a "better position [to] reconstruct" meaning. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2412 (2019) (quoting *Martin v. Occupational Health Safety and Review Comm'n*, 499 U.S. 144, 152 (1991)). But the regulatory language is not ambiguous. And even if it were, the EPA's long-standing interpretation would undermine its contention that it is returning to a contemporaneous understanding.

Before the Hunter Order, the EPA had consistently applied the Sierra Club's interpretation in Title V permitting procedures. Joint App'x at 11–13 (Hunter Order); *see also In the Matter of Pac. Coast Bldg. Prods., Inc.*, 1999 EPA CAA Title V LEXIS 12, at *13 (E.P.A. Dec. 10, 1999)

---

slip op. at 16 (5th Cir. May 29, 2020). But the Fifth Circuit did not discuss any of the other passages in the preamble that are quoted above in the text. *See id.*, *passim*. Nor did the Fifth Circuit discuss the EPA's previous references to the "second-guess" language when the EPA was embracing the Sierra Club's interpretation of the regulatory definition. *See* p. 24, above.

26

("[A]pplicable requirements include the requirement to obtain preconstruction permits that comply with preconstruction review requirements under the Act, EPA regulations, and [state implementation plans]."); *In the Matter of Roosevelt Reg'l Landfill Reg'l Disposal Co.*, 1999 EPA CAA Title V LEXIS 10, at \*14–15 (E.P.A. May 4, 1999) (virtually identical language). The EPA does not point to any prior petitions or cases applying its allegedly "original construction." Oral Arg. at 26:45–27:25.[13]

For these reasons, we conclude that the preamble does not support the EPA's interpretation or create ambiguity in the regulation. *See Callahan v. U.S. Dep't of Health and Human Servs. through Alex Azar II*, 939 F.3d 1251, 1263–64 (11th Cir. 2019) ("[T]he regulatory history is—at best—a mixed bag . . . . [T]o the extent they are discernible, [the

---

[13] The EPA draws support from a guidance document issued in the late 1990s. Oral Arg. at 27:00. That document states that the EPA "generally will not object to the issuance of a title V permit due to concerns over BACT [best available control technology and similar determinations] made long ago during a prior preconstruction permitting process." Letter from John S. Seitz, Envtl. Prot. Agency, to Robert Hodanbosi & Charles Lagges, STAPPA/ALAPCO (May 20, 1999). But the document also explains that the EPA "may object to or reopen a title V permit in response to a public petition showing that title I preconstruction permitting requirements have not been met." *Id*. This explanation applies here: The Sierra Club is insisting that the EPA object to PacifiCorp's Title V permit based on a failure to satisfy the requirements in Title I.

27

provision's] 'purpose' and 'history' provide no basis for second-guessing . . . what its text and structure clearly indicate.").

### 4. The Fifth Circuit's Opinion in *Environmental Integrity Project v. EPA*

The EPA argues that its interpretation of "applicable requirements" was recently embraced by the Fifth Circuit in *Environmental Integrity Project v. EPA*, No. 18-60384, ___ F.3d ___ (5th Cir. May 29, 2020). There the Fifth Circuit Court of Appeals concluded that the EPA's interpretation does not conflict with the Clean Air Act. *Envtl. Integrity Project v. EPA*, No. 18-60384, ___ F.3d ___, slip op. at 12 (5th Cir. May 29, 2020). In reaching this conclusion, the Fifth Circuit didn't consider whether the EPA's interpretation conflicted with the regulatory definition of "applicable requirements." *Id.* at 10 n.6. The court reasoned that the EPA had not claimed deference based on its regulatory interpretation. *Id.* The court acknowledged that the Hunter Order had rested on how the EPA interpreted its regulatory definition of "applicable requirements." *See id.* ("We note that the *Hunter* Order itself and EPA's order in this matter both claim to interpret not § 7661c(a) but instead § 70.2."). But the parties didn't present an argument on interpretation of the regulation, so the Fifth Circuit relied on its interpretation of the statute (§ 7661c(a)) rather than the regulatory definition of "applicable requirements." *See, e.g.*, *id.* at 15 ("We conclude EPA has the better reading of § 7661c(a).").

28

Though the Fifth Circuit interprets the statute, rather than the regulation, the court refers several times to the regulations. For example, the court states that it finds the Hunter Order's "reasoning persuasive as a construction of the relevant provisions of Title V and its implementing regulations." *Envtl. Integrity Project v. EPA*, No. 18-60384, ___ F.3d ___, slip op. at 11 (5th Cir. May 29, 2020). The court also says that it asks "whether EPA's interpretation of Title V and its implementing regulations in the *Hunter* Order is persuasive." *Id.* at 12. And the court notes that it analyzes the Hunter Order as a construction of not only the regulation but also of the Clean Air Act. *Id.* at 12 n.7. Despite these references to the regulation, the opinion elsewhere makes clear that the court is interpreting only the statute. For example, the court acknowledges that in opposing the petition for review, the EPA relied solely on the statute and made no argument involving the regulations. *Id.* at 10 n.6.

In our case, the Sierra Club also argues that the EPA's interpretation conflicts with the Clean Air Act itself. But in the order being reviewed, the EPA relied on its interpretation of the regulation. *See Envtl. Integrity Project v. EPA*, No. 18-60384, ___ F.3d ___, slip op. at 10 n.6 (5th Cir. May 29, 2020) ("We note that the *Hunter* Order itself and EPA's order in this matter both claim to interpret not § 7661c(a) but instead § 70.2."). We thus "judge the propriety" of the Hunter Order "solely by the grounds invoked by the agency": interpretation of the term "applicable requirements" in the

29

regulation. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Because we determine that the regulation precludes the EPA's interpretation, we need not reach the statutory issue underlying the Fifth Circuit's recent opinion.[14]

\* \* \*

We conclude that the EPA's interpretation of the regulation conflicts with its unambiguous language.

## VI.   The Intervenors' Other Arguments

Two intervenors, the State of Utah and PacifiCorp, present other arguments[15] relating to

- the merits of the Sierra Club's petition for the EPA to object and

- the issue of timeliness.

But the Sierra Club's petition for review does not involve the merits of the petition to object and the time bars do not apply.[16]

---

[14]   The Sierra Club also argues that the EPA's interpretation of "applicable requirements" was arbitrary and capricious. We need not address this argument.

[15]   The amicus raises other issues. But the amicus is not a party, and we ordinarily decline to consider arguments raised only by an amicus. *See Kerr v. Hickenlooper*, 824 F.3d 1207, 1216 (10th Cir. 2016) ("An amicus is not a party."); *Tyler v. City of Manhattan*, 118 F.3d 1400, 1404 (10th Cir. 1997) (stating that we will consider issues newly advanced by an amicus only in a "truly . . . exceptional case").

[16]   The Sierra Club contends that the intervenors cannot raise new issues. *See Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 675 (D.C. Cir. 2013) (per curiam) (Silberman, J., concurring) (noting that a "thorny"

30

## A.    The Merits of the Sierra Club's Petition for Review

We reject the efforts by PacifiCorp and the State of Utah to defeat the petition for review based on the merits of the Sierra Club's underlying challenge to renewal of the Title V permit.

### 1.    Waiver

PacifiCorp argues that the Sierra Club waived its challenge by failing to prove the merits (the applicability of major NSR requirements). We disagree. The EPA didn't reach the merits of the Sierra Club's petition to object, relying instead on the meaning of the regulatory term "applicable requirements." Given this reliance, the Sierra Club focused on the EPA's reasoning and had no reason to argue the merits of the underlying petition. We thus reject PacifiCorp's assertion of a waiver. *See Indus. Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607, 631 n.31 (1980) ("[T]he validity of

---

question could arise as to the ability of an intervenor to raise new issues as the respondent); *see also Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1269 (11th Cir. 2001) (affirming the denial of intervenor-defendants' motion because of the court's "broad authority to limit the ability of intervening parties to expand the scope . . . beyond the issues litigated by the original parties").

We have held that parties intervening as petitioners cannot raise new issues. *See Arapahoe Cty. Public Airport Auth. v. FAA*, 242 F.3d 1213, 1217 n.4 (10th Cir. 2001) ("[A]s an intervening party, the City may join issue only on matters brought before the court by the Authority as petitioner."). But the State of Utah and PacifiCorp intervened as respondents, not petitioners. And we have not addressed whether an intervenor acting as a respondent can raise a new issue to defeat a petition for review. We need not decide this issue because the intervenors' additional arguments fail on other grounds.

31

an agency's determination must be judged on the basis of the agency's stated reasons for making that determination.").

## 2. Failure to Demonstrate Emissions Triggering Major NSR Requirements

PacifiCorp and the State of Utah also argue that the Sierra Club failed to demonstrate that emissions would have exceeded the threshold for major NSR. *See* 42 U.S.C. § 7661d(b)(2) (requiring petitioners to demonstrate that proposed Title V permits do not comply with the Clean Air Act). But this argument again overlooks the EPA's reasons for rejecting the petition. The EPA rejected the petition based on the meaning of the term "applicable requirements," not a failure to demonstrate emissions triggering major NSR requirements. And our review is confined to the EPA's reasons for its decision. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *see also* p. 30, above.

## B. Timeliness

We also reject the intervenors' arguments as to timeliness.

## 1. Statutory Time-Bar

Title V provides that if the EPA does not object to a Title V permit within 45 days, "any person may petition the Administrator within 60 days after the expiration of the 45-day review period." 42 U.S.C. § 7661d(b)(2).

The Sierra Club filed a petition within the 60-day period. But PacifiCorp and Utah argue that the relevant time period had expired in 1998 (when Utah issued the original Title V permit). We reject this argument because

- we are to review only the EPA's reasons for denying the petition to object and

- the Sierra Club's petition to object was timely.

First, the EPA denied the petition to object based on the meaning of the term "applicable requirement"—not timeliness. And we review only the EPA's reason for denying the petition to object. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *see* p. 30, above.

Second, the Sierra Club did timely object to the 2016 Title V Permit, and the EPA must object to a Title V permit if it does not include all "applicable requirements." 42 U.S.C. § 7661d(b)(1).

PacifiCorp relies on *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010). According to PacifiCorp, *Otter Tail* said that absent clear evidence to the contrary, the court would conclude that Congress had not intended to "allow plaintiffs to raise issues resolved during the permitting process long after that process is complete." 615 F.3d at 1022. But in *Otter Tail*, the petitioner had initiated a citizen suit after failing to use Title V's permitting process. 615 F.3d at 1012–13.

The situation here is the opposite, for the Sierra Club is doing what was not done in *Otter Tail*: objecting during the Title V permitting process. In *Otter Tail*, the Eighth Circuit reasoned that the failure to object during the permitting process tanked a later objection because the Title V permitting process was the only way to obtain review of the EPA's failure to object. *Id.* at 1020; *see* 42 U.S.C. § 7661d(b)(2). So *Otter Tail* does not suggest that the Sierra Club waited too long to act.

## 2. Laches

PacifiCorp also invokes the doctrine of laches. This doctrine bars relief when the petitioner's unreasonable delay prejudiced the respondent. *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1337–38 (10th Cir. 1982). But the doctrine of laches is disfavored in environmental cases. *Id*; *see also Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1031 (9th Cir. 2012) ("Because environmental damage does not inflict harm only on the plaintiff, laches is strongly disfavored in environmental cases.").

This disfavored defense is unavailable here. The Clean Air Act requires the EPA to object to a Title V permit if a petitioner demonstrates that the permit doesn't comply with the Clean Air Act. 42 U.S.C. § 7661d(b)(1), (b)(2). This requirement cannot be displaced through laches. *See SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 960–61 (2017) ("[A]pplying laches within a limitations period specified by Congress would give judges a 'legislation-

34

overriding' role that is beyond the Judiciary's power." (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 680 (2014))). So the defense of laches is unavailable to PacifiCorp as an intervening respondent.

### 3. Characterization of the Petition as a Collateral Attack

Utah also argues that its state implementation plan requires use of state permitting procedures, preventing the Sierra Club from invoking the Title V proceedings to collaterally attack the minor NSR permit issued in 1997.[17] But Congress has prescribed the administrative procedure for objections to Title V permits. Under this procedure, the EPA must object when the Title V permit omits an applicable requirement. 42 U.S.C. § 7661d(b)(1), (b)(2). And the applicable requirements include the appropriate form of NSR. *See* pp. 15–30, above. So if the Sierra Club demonstrates the applicability of major NSR requirements, the EPA must object to the Title V permit even if the Sierra Club's petition could be viewed as a collateral attack on Utah's permitting decision in 1997.[18]

\* \* \*

---

[17]    The EPA also presents a similar argument.

[18]    Utah also asserts the importance of finality in its permitting processes. But the importance of finality constitutes a policy argument against an open-ended Title V permit renewal process. This policy argument cannot override unambiguous regulatory language. *See In re Sweeney*, 492 F.3d 1189, 1192 (10th Cir. 2007) ("[T]he public policy effects are not ours to resolve in the face of unambiguous statutory language.").

35

We conclude that the EPA's interpretation of "applicable requirements" in the Hunter Order conflicts with the unambiguous regulatory definition. We thus vacate the Hunter Order and remand to the EPA for further consideration of the petition.