# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 04-2354/2862

_____

| | | |
|---|---|---|
| Mid-America Real Estate Company d/b/a Coldwell Banker Mid-America Group, Realtors, | * * * * | |
| Appellee, | * * | Appeals from the United States District Court for the Southern |
| v. | * * | District of Iowa. |
| Iowa Realty Company, Inc.; First Realty, Ltd., | * * * | |
| Appellants. | * | |

_____

Submitted: February 16, 2005
Filed: May 6, 2005

_____

Before MORRIS SHEPPARD ARNOLD, BOWMAN, and GRUENDER, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Iowa Realty Company and First Realty, Ltd. (collectively "Iowa Realty") appeal from the district court's entry of a preliminary injunction against them in Coldwell Banker's action for breach of contract and breach of an implied covenant of good faith and fair dealing. (Coldwell Banker's complaint also claims that Iowa Realty violated federal antitrust laws, but the district court found that Coldwell Banker was not likely to succeed on these claims, and they are not a subject of this

appeal.)  We hold that the district court correctly decided that Coldwell Banker is likely to prevail on the merits of the breach-of-contract claim, erred as a matter of law when it concluded that Coldwell Banker is likely to prevail on the merits of the breach-of-implied-covenant claim, and abused its discretion in ruling that Coldwell Banker will suffer irreparable harm absent an injunction.  We therefore dissolve the preliminary injunction.

I.

Iowa Realty is a real estate brokerage firm in Des Moines, Iowa.  It holds a license which entitles it to exclusive use, in the Des Moines area, of a software system known as MLXchange.  MLXchange is a database management system used to store, search, and communicate data on residential real estate listings.  Coldwell Banker decided that the MLXchange system was better than the system it was using, so it approached Iowa Realty and asked for a sublicense to use the software.  After some discussion, Iowa Realty assented and entered into a contract with Coldwell Banker.  The parties dispute the precise terms of the arrangement, but agree that under it  Iowa Realty granted Coldwell Banker a sublicense to use the software and guaranteed Coldwell Banker access to at least some of the listings that it (Iowa Realty) would store on the MLXchange system; Coldwell Banker promised, in return, to help fund a mailing advertisement and permit Iowa Realty to access at least some of the listings that it would store on the MLXchange software.

After the parties entered into this contract, Iowa Realty announced that it intended to launch a new home marketing program named Passport Plus.  Passport Plus is an office-exclusive program, meaning that if a seller were to agree to sell his or her house pursuant to it, only Iowa Realty agents would be able to show and sell the house.  (In other words, the listing would be an office-exclusive one.)  Iowa Realty would offer incentives to sellers who join this program, to offset the fact that there could be a smaller pool of buyers.  The benefit of the program for Iowa Realty would be that it would receive the whole of the sales commission; when two

brokerages are involved in the sale of a house in the Des Moines area, they usually split the commission. Iowa Realty would store information about Passport Plus listings on a part of the MLXchange that would be inaccessible to Coldwell Banker.

Before Iowa Realty implemented the program, Coldwell Banker filed its complaint, which requests both preliminary and permanent injunctions. The complaint claims that implementation of the program would effect a breach of the contract and the implied covenant of good faith and fair dealing. The primary breach-of-contract claim is that the program would violate the provisions of the contract that entitle Coldwell Banker to access data that Iowa Realty stores on the MLXsystem. The breach-of-implied-covenant claim is that the Passport Plus program would deny Coldwell Banker the opportunity to receive the fruits of the contract, to wit, the opportunity to sell houses and share in the resulting sales commissions. Iowa Realty agreed not to initiate the program before the district court ruled on the request for a preliminary injunction.

The district court concluded that Coldwell Banker was likely to succeed on the merits of its contract and implied-covenant claims and suffer irreparable harm absent an injunction. It therefore issued a preliminary injunction. The court enjoined Iowa Realty from, among other things, denying Coldwell Banker access to information on the MLXchange database, "actively offering or soliciting exclusive listing contracts," refusing "to cooperate" with Coldwell Banker in the selling and buying of homes, and refusing to split commissions "in accordance with the established course of dealing."

We note that the court also initially enjoined Iowa Realty's conduct with respect to certain third parties, but later entered an order that partially eliminated this feature of the injunction. Iowa Realty insists that the court's modification order is invalid and that the original restrictions on third-party conduct thus remain in place. But we need not resolve this issue because our holding renders it moot: The allegedly

overly-broad injunctive obligations (those involving the third parties) relate to claims on which Coldwell Banker cannot prevail.

## II.

"A District Court's decision to grant a preliminary injunction will not be overturned absent a clearly erroneous factual determination, an error of law, or an abuse of discretion." *Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1041 (8th Cir. 2003). Whether a preliminary injunction is appropriate depends on four considerations: the probability that the movant will succeed on the merits; the threat of irreparable harm to the movant should the court deny the injunction; the balance between this harm and the harm that granting the injunction will cause to the other litigants; and the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). A court should balance these considerations when deciding whether to issue an injunction. *Taylor Corp.*, 315 F.3d at 1041. But an injunction cannot issue if there is no chance of success on the merits, *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 589 (1984) (O'Connor, J., concurring); *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002), and must be dissolved if the district court's findings of fact do not support the conclusion that there is a threat of irreparable harm. *Cf. Dataphase Sys.*, 640 F.2d at 114 & n.9.

## III.

Iowa Realty contends that the district court erred in deciding that Coldwell Banker was likely to succeed on the merits of either of its claims. We turn first to the breach-of-contract claim. Section I.B.2 of the contract provides, "Coldwell users will have access to all application data in MLXchange Software," and § I.A.2 states, "Iowa Realty Group hereby grants to Coldwell a non-exclusive license to use the listing information ... that Iowa Realty Group shall enter into the MLXchange Software." As part of the Passport Plus program, Iowa Realty would store listing information on a part of the database that Coldwell Banker would not be able to access.

Iowa law governs the contract. The parties' intentions at the time that they executed the contract are the touchstone for determining its meaning. *Hofmeyer v. Iowa Dist. Court*, 640 N.W.2d 225, 228 (Iowa 2001). Unless the contract is ambiguous, we ascertain intentions from the language of the contract. *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991). Ambiguity need not exist before the court may consult extrinsic evidence, though, for we may look to extrinsic evidence to determine the meaning of language in the contract. *Hofmeyer*, 640 N.W. 2d at 228. "Any determination of meaning or ambiguity must be made in light of all of the circumstances, including the relations of the parties, subject matter of the transaction, preliminary negotiations, usages of trade, and the course of dealing." *Id.* Extrinsic evidence may not be used, however, to alter the terms of the agreement. *Financial Mktg. Servs., Inc. v. Hawkeye Bank & Trust of Des Moines*, 588 N.W.2d 450, 457 (Iowa 1999).

Iowa Realty argues that the contract does not address office-exclusive listings and that extrinsic evidence proves that it would not need to provide Coldwell Banker access to office-exclusive listings that it might store on the MLXchange system. According to Iowa Realty's brief, the sections of the contract "which the district court cited as supporting Coldwell's right to access listing information [which are the sections cited in the first paragraph of this part of the opinion, along with another similar section] are limitations on Coldwell's rights under the agreement, and not affirmative grants of access to information that the customer specifically directed to not be disseminated to other brokers." In light of this supposed contractual silence, Iowa Realty urges us to look to the parties' course of performance and to industry standards as aids in interpreting this agreement. These two considerations, it maintains, scotch the idea that the contract requires it to share office-exclusive listing information, as both demonstrate that such information is not to be disseminated.

We conclude that the district court correctly held that Coldwell Banker is likely to prevail on the merits of its breach-of-contract claim. The contract is not silent with

respect to how office-exclusive listings can be stored on the MLXchange system. Rather, the broad provisions granting Coldwell Banker access to information stored on the system by Iowa Realty encompass office-exclusive listings as well as any other sort of listing that Iowa Realty might store on the system: The contract grants Coldwell Banker the right to access "all application data in MLXchange Software" and "a non-exclusive license to use the listing information ... that Iowa Realty Group shall enter into the MLXchange Software." Whether the contract labels these provisions "limitations" or something else is unimportant because the labels do not change the meaning of the provisions; by the express terms of these clauses, the contract applies to all listing information entered into the MLXchange software.

Iowa Realty's extrinsic evidence does not convince us otherwise. It offers the evidence to alter the meaning of the contract, not to facilitate its interpretation, as shown by the fact that it does not explain how the evidence helps us to understand any relevant term of the contract, whether the term is "all application data," "use of listing information," or anything else. *See Financial Mktg.*, 588 N.W.2d at 457. Extrinsic evidence may not be used for this purpose. *Id.* Anyway, the extrinsic evidence presented by Iowa Realty is irrelevant. The evidence relates to whether Iowa Realty could, consistent with its obligations to its customers, share office-exclusive listing information, but no one contends that the contract obligates it to do that. To abide by the contract, Iowa Realty simply needs to refrain from storing office-exclusive listing information on the MLXchange system; it need not share this information.

## IV.

We next determine whether the district court properly concluded that Coldwell Banker is likely to succeed on the merits of its claim for breach of the implied covenant of good faith and fair dealing. As stated in its complaint, Coldwell Banker's claim is that the Passport Plus program, insofar as it entails the solicitation of office-exclusive listings and the related refusal to share commissions from sales of these

-6-

listings, will frustrate the purpose of the contract, which, it says, is to enable the parties "to share listings and commissions on cooperative transactions as part of a procompetitive cooperative venture." In other words, Coldwell Banker contends that the Passport Plus program would effect a breach of the implied covenant because Coldwell Banker would have access to a smaller percentage of Iowa Realty's listings (*i.e.*, would have the ability to sell a smaller percentage of the homes listed by Iowa Realty) and would necessarily lose out on the commissions for homes marketed by Iowa Realty as office-exclusive listings.

The district court decided that these allegations would likely find their mark. It noted that Iowa Realty's president admitted that the purpose of one section of the contract is to let the brokerages "use each other's data for the purpose of listing, selling, [and] buying residential real estate." The court continued, "the effect of Iowa Realty's decision to actively solicit office exclusive listings would be to limit Coldwell Banker's access to many of Iowa Realty Group's listings." Coldwell Banker could not have foreseen Iowa Realty's decision to add the Passport Plus program, the court added, because "the active solicitation of office exclusive listings is contrary to the parties' established course of dealing under the [contract]." Finally, the district court concluded that "by limiting the open exchange of listing information between parties, Iowa Realty Group restricts an essential purpose of the marketing agreement, thereby breaching the implied covenant of good faith and fair dealing." Thus, the court enjoined Iowa Realty from soliciting office-exclusive listings and ordered it to "cooperate" and split commissions with Coldwell Banker (apparently on all co-brokered sales).

The contract contains an implied covenant of good faith and fair dealing. *See Engstrom v. State*, 461 N.W.2d 309, 314 (Iowa 1990); *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 456 (Iowa 1989). The Iowa Supreme Court has adopted the definition of good faith employed by the Restatement (Second) of Contracts, which states that " '[g]ood faith performance or enforcement of a contract emphasizes

faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 34 (Iowa 1982) (quoting Restatement (Second) of Contracts § 205, comment a (1981)). Although § 205 of the Restatement (Second) addresses the "duty of good faith and fair dealing," it does not separately define "fair dealing," nor have we found any Iowa case that affords independent significance to the "fair dealing" language of the covenant.

While no Iowa Court has detailed the limits of the covenant, we believe that the Iowa Supreme court would conclude that the covenant does not "give rise to new substantive terms that do not otherwise exist in the contract," *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 700 (8th Cir. 2003). *See generally B.B. v. Continental Ins. Co.*, 8 F.3d 1288, 1291 (8th Cir. 1993). Our research reveals that "[i]t is universally recognized [that] the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373, 826 P.2d 710, 727 (1992); *see also Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 265 Neb. 133, 143, 655 N.W.2d 390, 400 (2003); *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 841 (S.D. 1990); *Glass v. Mancuso,* 444 S.W.2d 467, 478 (Mo. 1969). There is a good reason for this consensus: Allowing the covenant to create new substantive obligations would harm the "institution of contract, with all the advantages private negotiations and agreement brings," *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990), because it would permit courts to turn agreed-to contracts into wholly new ones which were never consented to. *Cf. Travelers Ins. Co. v. Budget Rent-A-Car Sys., Inc.*, 901 F.2d 765 (9th Cir. 1990). Instead of creating new substantive obligations, the covenant prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to that for which the contract was made. *See, e.g., Countrywide Servs. Corp. v. SIA Ins. Co.*, 235 F.3d 390, 393-94 (8th Cir. 2000); *Original Great*

*Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992).

We conclude as a matter of law that Coldwell Banker cannot succeed on the merits of its implied covenant claim because its claim is doomed by a lack of support in the text of the contract. *See Mattes*, 323 F.3d at 700. As we have said, an implied covenant of good faith and fair dealing cannot create substantive terms that do not otherwise exist in a contract. *Id.* But, as we demonstrate below, Coldwell Banker's position imposes such generative obligations on the covenant.

We start with Iowa Realty's obligation to "share listings." Iowa Realty's president testified that the purpose of § I.C.1 of the contract is to allow the parties to share listing information. This section assures Coldwell Banker that it "can use Iowa Realty Group's Listings and Listing Information" in certain ways. Importantly, though, the contract defines "Iowa Realty Group's Listings and Listing Information" as the "listing information ... that Iowa Realty Group shall enter into the MLX Software." There is a crucial difference between agreeing to share listing information and agreeing to sharing listing information that has been entered into the MLXchange software: the qualifier "enter[ed] into the MLXchange Software" limits Coldwell Banker's universe of justified expectations, obviating any reasonable expectation about the quantum of information that Iowa Realty will store on the system. Unqualified sharing language would admit of the reasonable possibility that Coldwell Banker expected to receive information about all non-office-exclusive listings and expected that Iowa Realty would not drastically increase the number of office-exclusive listings that it would offer. But the language in the contract is not unqualified; it provides for the sharing of listing information stored on the database. As such, Coldwell Banker cannot reasonably expect that a certain percentage of Iowa Realty's listings will be available to it, *i.e.*, it cannot expect that Iowa Realty will not implement an office-exclusive marketing program.

-9-

Section I.B.3 of the contract is Coldwell Banker's best hope for a textual foundation for its argument. Entitled "Timely Entry of Data," this clause states that "[e]ach Coldwell and Iowa Realty Group agree that their Listings and the corresponding Listing Information shall be entered into MLXchange software within 48 hours after all necessary signatures have been obtained." Based on this clause, Coldwell Banker could argue that the contract obliges Iowa Realty to save all of its listings on the shared database, thus barring it from implementing an office-exclusive marketing plan (as office-exclusive listings cannot be shared). But we conclude that this argument would fail. The contract defines listings and listing information as information that Iowa Realty and Coldwell Banker will enter into the database. Each of the brokerages, then, "agree[s] that [the information each will enter into the database] shall be entered ... within 48 hours after all necessary signatures have been obtained." In the case of an office-exclusive listing, "all necessary signatures" will never be obtained because an office-exclusive seller will not give them; this point was well known at the time the contract was drafted, as a core tenet of an "office-exclusive listing" is the seller's desire that the listing information not be disseminated. Owing to this signature proviso, then, the clause in § I.B.3 does not require the parties to store all of their listing information on the system (a requirement that would preclude them from maintaining office-exclusive listings). Instead, this clause simply requires them to enter a non-office-exclusive listing (or any other listing that can be shared) into the system within two days of the seller signing the necessary papers.

Iowa Realty's president's testimony does not dictate a different outcome. To the extent that his testimony is at odds with the language of the contract (and militates in favor of the conclusion that the contract creates a more robust cooperative scheme), the contract language prevails because extrinsic evidence cannot be used to alter the terms of a contract. *Financial Mktg.*, 588 N.W.2d at 457. The short of it, then, is this: the solicitation of office-exclusive listings would not violate the implied covenant of good faith and fair dealing because the contract does not support a

-10-

justified expectation about the percentage of Iowa Realty's listings to be stored on the database.

We turn now to the argument that the Passport Plus program violates the implied covenant of good faith and fair dealing because the contract was intended to guarantee commission splitting. We see no warrant for this contention in the language of the contract. Coldwell Banker disagrees, positing that the contract provides indirect textual support in two ways. For one, it contends, there is textual support by incorporation. In support of this contention, Coldwell Banker first points to a provision of the contract that allows it to use information about Iowa Realty's listings to assist Coldwell Banker's clients who have executed an "agency relationship agreement." It then directs attention to the following language from an agency agreement: "When two different brokerage companies cooperate in the sale of a listing, the listing broker will split commissions with the cooperating brokerage company representing the buyer." This argument is untenable. The two sentences in the agency agreement that immediately precede the one quoted above sink the argument: "Commissions are generally paid by the Seller or Landlord. Therefore, on listed property, the owner of any property with whom Buyer enters into an enforceable Purchase Agreement generally will pay Broker's commission." The phrases "generally paid" and "generally will pay" strip the agency agreement of the conclusiveness necessary to sustain the contention that the contract incorporates a promise of commission splitting.

Coldwell Banker also maintains that the textual support for its sharing-of-listing-information argument constitutes indirect textual support for guaranteed commission splitting. The argument goes as follows: Coldwell Banker and Iowa Realty must, as a matter of logic, have agreed to split commissions because they agreed to share listing information, and listing information is important only insofar as it allows each to locate buyers for houses marketed by the other and thereby share in the seller's commission. Even if we had been convinced that the contract required

Iowa Realty to share all listing information, we would not have been swayed by this argument; it depends on the false premise that the only reason a party would want to share listing information is for a guaranteed split of the commission. A party might share listing information for another reason. For example, it might do so simply for a chance to share in a sales commission, understanding that whether or not it would receive a share of the commission would depend on the particular circumstances of the sale. Because the language of the contract does not support the contention that the parties promised to share commissions, we conclude that Coldwell Banker cannot succeed on the claim that the implied covenant of good faith requires them to do the same. *See Mattes*, 323 F.3d at 700.

In light of our holding that Coldwell Banker cannot succeed on its breach-of-implied-covenant claim, we dissolve the injunction with respect to this claim. *See Stotts*, 467 U.S. at 589; *AM General*, 311 F.3d at 804. Specifically, we free Iowa Realty from the portions of the district court's order that bar it from actively soliciting office-exclusive listings and that require it to split commissions on real estate sales. We also annul the parts of the district court's order that require Iowa Realty to "cooperate" with Coldwell Banker and deliver listing information to the Des Moines Area Association of Realtors' Multiple Listing Service, since we think that these obligations flow from the district court's vision of the contract as an effort to establish a system of cooperative competition, a vision that we do not share because we find it lacking in textual support.

V.

Having decided that Coldwell Banker is likely to prevail on the merits of its breach-of-contract claim, we must decide whether it faces a threat of irreparable harm absent an injunction in its favor. The district court thought so and enjoined Iowa Realty from storing Passport Plus listings on the MLXchange software. But the court premised its conclusion on harms that are not relevant in light of our holding that Coldwell Banker cannot prevail on its breach-of-implied-covenant claim. We

-12-

conclude that the district court abused its discretion by concluding that Coldwell Banker would be irreparably harmed by Iowa Realty's breach of contract.

Underlying the district court's conclusion as to irreparable harm was its view that Coldwell Banker would sustain incompensable damage to its goodwill and reputation as a result of being unable to show the homes that Iowa Realty would market as office-exclusive listings. Because we have concluded that the implied covenant of good faith and fair dealing does not prohibit Iowa Realty from soliciting office-exclusive listings, these harms are irrelevant; an injury is legally irrelevant if the conduct from which it stems is legal. The relevant question is whether Coldwell Banker would be irreparably harmed by the conduct complained of in its breach-of-contract count, namely Iowa Realty storing information about office-exclusive listings on a part of the MLXchange software that would be inaccessible to Coldwell Banker.

For a court to enter a preliminary injunction, it must find that the moving party would be irreparably harmed absent an injunction. *United Healthcare Ins. Co. v. Advance PCS*, 316 F.3d 737, 740 (8th Cir. 2002). A district court abuses its discretion if its findings of fact do not evidence the considerations that must undergird a preliminary injunction. *Cf. Dataphase Sys., Inc.*, 640 F.2d at 114.

We conclude that the district court abused its discretion. In its order, the court did not find any facts regarding whether Iowa Realty's breach of contract would irreparably harm Coldwell Banker. Instead, its findings of fact focused on the breach-of-implied-covenant claim, and the supposed irreparable harm to Coldwell Banker of Iowa Realty soliciting office-exclusive listings. These findings do not justify the conclusion that Coldwell Banker would be irreparably harmed by Iowa Realty's breach of contract because this claim rests on a different factual predicate. This gap in the record fatally undermines the decision to enter a preliminary injunction barring Iowa Realty from storing Passport Plus listings on a portion of the MLXchange

system that would be inaccessible to Coldwell Banker.  *See Dataphase Sys.*, 640 F.2d at 114.  Therefore, we dissolve this portion of the injunction.

## VI.

For the above stated reasons, we dissolve the preliminary injunction and remand to the district court for further proceedings not inconsistent with this opinion.

_____